IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01668-MSK-KLM

PRODUCTION RESOURCE GROUP,
L.L.C.,

       Plaintiff,

v.

TIMOTHY P. DYER, KEVIN SCOGGINS,
JOSE CADENA, GREGORY TURNER,
and COGENT GLOBAL SOLUTIONS, INC.,

       Defendants.

---

## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

---

Plaintiff Production Resource Group, L.L.C. ("PRG" or the "Company"), by and through

its undersigned counsel, respectfully moves for entry of a preliminary injunction against

Defendants Timothy P. Dyer ("Dyer"), Kevin Scoggins ("Scoggins"), Jose Cadena ("Cadena"),

Gregory Turner ("Turner")—collectively referred to as the "Individual Defendants"—and Cogent

Global Solutions, Inc. ("Cogent"), pursuant to Fed. R. Civ. P. 65(a), and in support of this motion

states as follows:

## I.  INTRODUCTION AND PRELIMINARY RELIEF SOUGHT

PRG seeks injunctive relief to prevent Defendants from (1) continued solicitation of PRG's

customers and employees and (2) further use and disclosure of PRG's confidential information and

trade secrets, including: customer commission structures; customer expectations; terms of

contracts with customers; specialized pricing, including equipment and labor costs; profit margins;

key labor resources and requirements, including names of freelance staff that worked on past PRG

events; specific services and solutions provided; past designs and creative solutions, including designers used, budgets, third-party vendors used, and the third-party vendors pricing to PRG; digital engagement tools that are part of PRG's presentation management system; and PRG-specific changes made to customize data storage tools that make them unique to PRG.

The Individual Defendants are former employees of PRG.  Dyer resigned in May 2017 and formed Cogent in November 2017.  Scoggins resigned from PRG on December 29, 2017; and Cadena and Turner resigned on January 31, 2108.  All went to work for, and continue to work for, Cogent.  All Defendants are in direct competition with PRG.  PRG has been advised by several substantial customers that they have switched, or intend to switch, their business from PRG to Cogent.

The information that the Defendants misappropriated constitutes trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §1836, and the Colorado Uniform Trade Secrets Act ("UTSA"), C.R.S. §7-74-101 *et seq*., and also is protected under their respective agreements with PRG.  The Individual Defendants' actual and threatened solicitations of accounts they formerly worked with are in breach of their agreements and in violation of the DTSA and the UTSA.  Accordingly, and pending trial or arbitration on the merits, PRG requests that this Court enjoin Defendants as follows:

(1)     from using and/or disclosing PRG's Trade Secrets and requiring Defendants to immediately return and cease using all PRG Trade Secrets and other PRG property;

(2)     from soliciting PRG customers, as such solicitations are in violation of the Individual Defendants' contractual obligations to PRG and involve Defendants' improper use of PRG's Trade Secrets;

(3)     from soliciting PRG employees, as such solicitations are in violation of the Individual Defendants' contractual obligations to PRG and involve Defendants' improper use of PRG's Trade Secrets;

(4)     as to the Individual Defendants: from working for Cogent, as such work is in violation of their contractual non-competition provisions and necessarily threatens the use and/or disclosure of PRG's Trade Secrets; or alternatively, enjoining them from contacting PRG's customers and employees; and

(5)     directing Defendants to withdraw any responses to requests for proposals, and any bids for work, and any other solicitations that have not yet resulted in an award of work to Defendants, where such responses, bids, or solicitations were made with the use of PRG's Trade Secrets or in violation of PRG's contractual rights.

## II.     LOCAL RULE 7.1(a) STATEMENT OF CONFERRAL

PRG filed its Verified Complaint on June 29, 2018.  The summons and complaint have been served on Scoggins (personally on July 2), Turner (personally on July 2), Cogent (via its registered agent on July 3), Cadena (personally on July 9), and Dyer (personally on July 10).

Prior to filing the Verified Complaint, counsel for Plaintiff had attempted to confer with Defendants regarding its claims that underlie both the lawsuit and this Motion.  Defendants never responded to counsel for Plaintiff's attempts.  By messenger delivery on July 13, 2018, counsel for Plaintiff served a copy of this Motion on each Defendant, requesting that each advise as to whether he or it agree to entry of the preliminary injunctive relief requested herein, and stating that if they did not contact counsel for Plaintiff by 10 a.m. on July 16, Plaintiff would file this Motion. As of the time of filing of this Motion, no Defendant has contacted counsel for Plaintiff. Accordingly, PRG is confident Defendants oppose this Motion.

## III.     SUMMARY OF FACTS

### A.  PRG's Business and the Individual Defendants' Relative Autonomy

PRG works with the world's leading entertainment and event producers, designers, and creative talents to stage some of the most unique, challenging, and groundbreaking projects across a broad range of markets. From corporate, association, and automotive events, live music tours and festivals, theatre, television and film, to sports and other major public events, to permanent

installations at theme parks, retails stores, and performing arts centers, PRG is on-site, from concept through execution, with the most creative and cutting-edge production solutions available. Compl. ¶15.[1]

PRG consists of several divisions, including its Corporate Events and Tradeshow Group (the "Corporate Events Group"), which leads event and production solutions services for tradeshow organizers and exhibitors, corporate events, conventions, and special events. Its thoughtful integration of traditional audiovisual technologies such as lighting, audio, video, rigging, automation, and staging, with the latest innovations, such as projection mapping, interactive content systems, LED technologies, and virtual events, sets it apart from the competition. Compl. ¶16.

Examples of Corporate Events Group projects include conventions or special events sponsored by trade or business associations. The association will provide content and strategic vision for the event, but it often does not employ staff to take that content strategic vision and transform it into the actual event. To accomplish that—to actually put on the event—the association contracts with PRG to handle the site selection, retention and managing of vendors, required construction at the venue, and related logistics. Compl. ¶17.

PRG often obtains its contracts through Experient, which acts as a broker of sorts between the association and the vendor chosen for the contract and, in that role, controls the flow of opportunities on which PRG gets to bid. Typically, Experient will issue a request for proposal, or "RFP," for an association's event, and it has a strong influence in the decisionmaking process leading to the award of the contract. The selected bidder then contracts with Experient to execute the event for the association. PRG's history, reputation, and relationships with Experient are

---

[1] References to "Compl. ¶__" and to "Compl. Ex. __" are to the numbered paragraphs in and exhibits attached to, respectively, PRG's Verified Complaint For Injunctive And Other Relief filed on June 29, 2018.

crucial, as Experient's appreciation of and value attributed to PRG's capabilities can influence the award and subsequent servicing of contracts. The Individual Defendants interacted with Experient's staff in representing PRG to Experient's customers to solicit and service their business. Compl. ¶18.

Historically, the contracts with the customers for which the Individual Defendants were responsible are negotiated to cover a three-year time span. This practice is beneficial to the customer and to PRG. It is beneficial to the customer because it allows the customer to have budgetary certainty for multiple years and continuity in the production of its events. It is beneficial to PRG because it also allows for long-term planning and revenue projection and creates the opportunity to deepen ties with the customer, which benefits result from being relieved of engaging in a competitive bidding process each year. Compl. ¶19.

On January 31, 2010, PRG entered into an agreement to purchase substantially all of the assets of Davis Audio Visual LLC, and PRG consummated the purchase pursuant to that agreement. Dyer was an equity member of Davis Audio Visual LLC and received substantial consideration as a result of the sale. Compl. ¶20.

The Individual Defendants had been employed for substantial periods of time for Davis Audio Visual LLC. While at Davis Audio Visual LLC, the Individual Defendants had been responsible for generating and/or servicing trade association business. Compl. ¶21.

At PRG, the Individual Defendants shared customer responsibilities, including generating and/or servicing trade association business. Indeed, their work was almost exclusively with trade association business. At PRG, the Individual Defendants worked with customers that, cumulatively, generated millions of dollars of business annually. To put it in perspective, in 2017 the Individual Defendants played a part in approximately 7.6% of the Corporate Events Group's

total North American revenue, and more than half of that was through Experient.  Compl. ¶¶ 22–23.  Dyer's title was General Manager; Scoggins' title was Project Manager; Cadena's title was Senior Account Executive, previously Show Operations Production Manager/Account Executive; and Turner's title was Director of Global Accounts, previously Show Operations Sales Manager/Account Executive.  Compl. ¶¶ 24, 29, 32, 34, 37, 39.

Dyer was responsible for all aspects of the PRG Denver operations, including all operations, account servicing, and new account development.  As General Manager, he was the signing party on all contracts executed by Denver staff and had final authority on contract pricing and terms.  Ultimately, Dyer had final responsibility for all revenue and expenses for business generated by PRG Denver as well as business serviced by PRG Denver that was sold by other PRG locations.  Dyer performed these job duties with a very high level of autonomy.  Dyer did not report or require approval for his substantive actions or decisions regarding the performance of his job duties.  In addition, Dyer supervised 24-30 full-time staff members.  As a part of his supervisory responsibility, Dyer provided input for the performance reviews of the employees he supervised; he interviewed candidates for jobs; he had hiring and firing authority; and he had input into pay decisions for his subordinates.  PRG paid Dyer almost twice what PRG paid Scoggins and over 20% more than what PRG paid Cadena and Turner.  Compl. ¶25.

Scoggins generally was responsible for the execution of the technical elements of all on-site labor for the project, including the lighting, audio, video, I.T. support, and rigging.  Scoggins performed these job duties with a very high level of autonomy.  In addition, Scoggins supervised the on-site laborers at the event, some of whom were PRG employees. Compl. ¶30.

Cadena had responsibilities similar to those of Scoggins, but generally dealing with larger, more complex events.  In addition, Cadena solicited business for PRG and was responsible for

managing the customer relationship for PRG, including ensuring retention of the customer, acting as the principal PRG representative in communications with the customer, handling project quotes and billing, and ensuring the project manager for the particular event properly executes on the agreed-upon services for the event.  Cadena performed these job duties with a very high level of autonomy. In addition, Cadena supervised the on-site laborers at the event, some of whom were PRG employees.  Compl. ¶35.

Turner generally was responsible for managing the customer relationship for PRG, including ensuring retention of the customer, acting as the principal PRG representative in communications with the customer, handling project quotes and billing, and ensuring the project manager for the particular event properly executes on the agreed-upon services for the event; and he also was responsible for obtaining business from existing and new customers.   Turner performed these job duties with a very high level of autonomy.  Compl. ¶40.

**B. PRG's Business Relies Substantially on Customer-Related Confidential Information and Trade Secrets.**

Critical to PRG's success and competitive advantage is its proprietary business and customer information (the "Trade Secrets"), which permit it to understand its customers' buying habits, solutions that influence their decisions, staff personalities they prefer to work with, financial framework of agreements, and preferred technology to ensure the successful execution of events. Its decisions are not based on simple models; rather they are individualized decisions based on nonpublic, confidential, and highly valuable competitive information.  Compl. ¶48.

Based on PRG's current understanding, the PRG Trade Secrets misappropriated and improperly used by one or more of the Defendants have been one or more of the following regarding current or recent PRG customers: commission structure to Experient; customer expectations; terms of contracts with customers; specialized pricing, including equipment and

labor costs; profit margins; key labor resources and requirements, including names of freelance staff that worked on past PRG events; specific services and solutions provided; past designs and creative solutions, including designers used, budgets, third-party vendors used, and the third-party vendors pricing to PRG; digital engagement tools that are part of PRG's presentation management system.  To assist in its customer relations and development, PRG also utilizes a customer relationship management system, SalesForce.com, which PRG customized and which houses all of PRG's confidential customer data.  Moreover, the Individual Defendants know the changes made to customize the off-the-shelf SalesForce.com product to make it unique to PRG, including the structure, protocols, and reporting changes.  The Trade Secrets described in this paragraph are not public, are highly confidential, and provide PRG a distinct competitive advantage.  Compl. ¶49.  PRG has taken reasonable measures to safeguard the secrecy of its Trade Secrets.  Compl. ¶¶ 60–64.

While with PRG, among other things, the Individual Defendants had access to and utilized substantial Trade Secrets, including but not limited to all items identified in the foregoing paragraph.  In addition, the Individual Defendants could run reports detailing and comparing whatever data they desired in the SalesForce.com tool.  Compl. ¶50.

The Trade Secrets referenced above are not publicly available or known and are critical to how PRG grows and manages its customer relationships and opportunities. All of the Trade Secrets are commercially valuable because they provide a roadmap for a competitor to target the key individuals at each customer who may facilitate sales and/or provide access to decision makers on contracting decisions within those companies and to know the customer's history and preferences, as well as the terms of the customer's contracts with PRG.  Compl. ¶51.

For example, that portion of the meetings and event industry that focuses on industry or trade group associations must pay keen attention to budgetary issues, as the associations are not-for-profits.  Knowledge of pricing strategy is developed through experience with the associations and PRG's particular method of addressing the associations' cost concerns.  To develop this expertise, PRG has specific people work on association business—those persons included the Individual Defendants.  Compl. ¶52.

In addition, some customers, including American Farm Bureau, American Academy of Religion, and Society of Biblical Literature, do not issue formal requests for proposals that outline the required scope of the services they are seeking.  The only means of responding meaningfully to their sponsored events is through institutional knowledge gained from having worked on those events at PRG.  Turner and Cadena possess that knowledge with respect to American Farm Bureau.  Turner possesses it with respect to Academy of Religion and Society of Biblical Literature.  Compl. ¶53.

PRG derives substantial independent value from its Trade Secrets not being known generally and not being ascertained readily by other persons and entities, such as Cogent, that could derive economic value from their disclosure or use.  Even utilizing all of the competitive advantages that its Trade Secrets provide, it generally takes approximately 15 to 18 months for PRG to identify, prepare a solicitation, and construct a bid for a new project.  Even where the customer issues a request for proposal, it can take up to two months for PRG to prepare its response.  Compl. ¶¶ 54–55.

The Individual Defendants were privy to PRG's Trade Secrets.  Defendants themselves recognize the value of the Trade Secrets, as evidenced by the following statement on Cogent's website:

> Not only is your account team going to remain the same, but we also guarantee that your event information is kept private and confidential. We have worked hard to develop a secure process that allows us to safeguard your data and only share it with authorized people. Our purpose for this is not only making sure your information does not get in the hands of unapproved people; additionally, it allows us to protect vital historical data so that you will be able to look back on your previous events and not have to start from scratch every single year. We promise to protect your data and ensure you have access to it when you need it.

*See* http://cogentglobalsolutions.com/about-cogent#1514955521543-d14261dc-10af (as of June 28, 2018 at 7:14pm Mountain Time).  Compl. ¶¶ 56–57.

Defendants' misappropriation of PRG's Trade Secrets results in harm to PRG that is crippling in its immediate impact because it has severed some longstanding customer relationships and put others at risk, including jeopardizing work expected to be awarded to PRG but that now may be awarded to Cogent and threatens to undermine years of work compiling Trade Secrets. Compl. ¶58.

The long-term effects of Defendants' misappropriation—and threatened continued misappropriation—are potentially devastating and incapable of precise measurement, such that the harm caused by Defendants if they are not enjoined will be irreparable and not capable of remedy by monetary relief alone.  Compl. ¶59.

## C. The Individual Defendants Are Violating their Agreements and Have Misappropriated PRG's Trade Secrets, and Cogent Supports their Misconduct.

The Individual Defendants each are subject to contractual agreements not to solicit PRG's employees or customers.  Compl. ¶¶ 63–68, Exs. A–H.  Nonetheless, they already have solicited PRG employees and at least 14 customers; and at least four customers already have switched their business to Cogent.  The solicitations arose out of the Individual Defendants' use of the Trade Secrets and leveraging the goodwill and relationships that PRG had paid them to create and enhance.  Compl. ¶¶ 69–75.

Dyer's conduct, in his capacity as Executive Vice President of Cogent (Compl. ¶28), is imputed to Cogent.  Similarly, the conduct of Scoggins as Event Production Manager (Compl. ¶31), as well as the conduct of any other Individual Defendant in a management position at Cogent, is imputed to Cogent.

By their actions—including their failure to respond to counsel for PRG's pre-litigation correspondence (Compl. ¶76)—Defendants have demonstrated that, unless enjoined from doing so, they will continue to solicit PRG's employees and customers and will use PRG's Trade Secrets in doing so.

## IV.    ARGUMENT

### A.  Legal Standard Governing Issuance of a Preliminary Injunction

A preliminary injunction should be issued here because PRG can demonstrate: (1) its likelihood of success on the merits; (2) the likelihood that it will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in PRG's favor; and (4) the preliminary injunction is in the public interest. *Double-click, Inc. v. Paikin,* 402 F. Supp. 2d 1251, 1254-55 (D. Colo. 2005); *see also Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,* 269 F.3d 1149, 1154 (10th Cir. 2001); *DuVall v. Keating,* 162 F.3d 1058, 1062 (10th Cir. 1998).  As shown below, PRG satisfies these criteria.

### B.  PRG Is Likely to Succeed on the Merits of its Claims.

PRG will succeed on its claims against Defendants, including its claims for violation of the DTSA and the UTSA, and for breach of, and intentional interference with, contract.

### 1.  *Defendants misappropriated PRG's Trade Secrets.*

The DTSA defines a "trade secret" to include "financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes"

that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."   18 U.S.C. §1839(3).   Similarly, the UTSA defines a "trade secret" to include "confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value." C.R.S. §7-74-102(4).

Factors relevant to recognizing a trade secret include (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against its competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information. *Hertz v. The Luzenac Group,* 576 F.3d 1103, 1108 (10th Cir. 2009) (quoting *Harvey Barnett, Inc. v. Shidler,* 338 F.3d 1125, 1129 (10th Cir. 2003), and citing *Colorado Supply Co. v. Stewart,* 797 P.2d 1303, 1306 Colo. App. 1990)).

The Tenth Circuit has cautioned courts "to apply the correct framework" when analyzing these so-called "*Colorado Supply*" factors in cases where trade secrets consist of a combination of characteristics and components, some of which are public, *Luzenac,* 576 F.3d at 1109:

> [A] trade secret can exist in a combination of characteristics and components each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.

*Id.* (quoting *Harvey Barnett,* 338 F.3d at 1129); *see also Gold Messenger, Inc. v. McGuay,* 937 P.2d 907, 911 (Colo. App. 1997). That is, "[u]nder Colorado law, 'information can be a trade secret notwithstanding the fact that some of its components are well-known.'" *Id.* (quoting *Harvey*

*Barnett,* 338 F.3d at 1129, and citing *Rivendell Forest Prods., Ltd. v. Ga.-Pac. Corp.,* 28 F.3d 1042, 1045 (10th Cir. 1994)). These same principles apply to recognizing trade secrets under federal law. *See* 18 U.S.C. 1839(3).

In this case, PRG has developed information and data about its customers that is not publicly available, including unique compilations of such data. This information includes, without limitation: customer expectations; terms of contracts with customers; specialized pricing, including equipment and labor costs; profit margins; key labor resources and requirements, including names of freelance staff that worked on past PRG events; specific services and solutions provided; past designs and creative solutions, including designers used, budgets, third-party vendors used, and the third-party vendors pricing to PRG; and digital engagement tools that are part of PRG's presentation management system. Compl. ¶49. These Trade Secrets are encompassed in the Individual Defendants' respective agreements and qualify as trade secrets under Colorado and federal law.

Courts recognize that the information PRG seeks to protect constitutes trade secrets. *See, e.g., Luzenac,* 576 F.3d at 1113; *Haggard v. Synthes Spine*, No. 09-cv-00721, 2009 WL 1655030, at *9 (D. Colo. June 12, 2009). In *Synthes Spine,* the court held that "detailed information regarding [a former medical device sales representative's] customers (doctors and hospitals within his sales territory)" was "exactly the type of information that, when organized in a unique manner . . ., is entitled to trade secret protection". *Id.* The former sales representative in that case "developed information regarding his customers' surgical specialties, business preferences, and contact people within their hospital or physician groups . . . as part of his employment for Defendant." *Id.* The court in *Synthes Spine* rejected the former sales representative's argument that the compilation was not a trade secret because much of the information—*e.g.*, doctors' names,

practice areas, and telephone numbers—"could be gleaned from public sources like a phone book or the internet." *Id.* The court emphasized that the information was "obtained solely as a result of [the former sales representative's] employment with [the medical device company] and the relationships he established with his customers," and that a "'stranger' could not develop the same type of information about the doctors and hospitals in his territory from a phone book or website." *Id*. Thus, these types of information, together with company documents concerning customers, were entitled to trade secret protection. *Id.* The *Synthes Spine* analysis and holding apply to the facts here as well.

The Tenth Circuit has unequivocally held that the manner in which PRG compiled its information supports its status as a trade secret. "A customer list can be a trade secret when it is the end result of a long process of culling the relevant information from lengthy and diverse sources, even if the original sources are publicly available." *Luzenac*, 576 F.3d at 1114.

PRG's other confidential and proprietary information, like much of the information compiled about its customers, is not known outside the business. *See Luzenac*, at 1108 (setting forth *Colorado Supply* factors). By way of example only, the information PRG compiles permits it to understand its customers' buying habits, solutions that influence their decisions, staff personalities they prefer to work with, financial framework of agreements, and preferred technology to ensure the successful execution of events. Compl. ¶48. PRG takes reasonable and considerable precautions to guard the secrecy of its trade secrets and confidential information. Compl. ¶¶ 60–64.

The final three *Colorado Supply* factors—the value to PRG in having its trade secrets as against its competitors, the amount of effort or money expended in obtaining and developing the information, and the amount of time and expense it would take for others to acquire and duplicate

the information—further illustrate that PRG's confidential information is a trade secret. PRG has compiled its information over a significant period of time and at considerable cost. Compl. ¶¶ 48-49, 53, 55.  Defendants will gain a profoundly unfair advantage by reaping the benefits of PRG's Trade Secrets.  Compl. ¶¶ 51-53, 55.  Defendants here have taken in no time, and at no cost, what it took PRG years and incalculable sums to develop.

Moreover, the Individual Defendants cannot credibly claim to be able to solicit their former PRG accounts, or any accounts on behalf of Cogent, without using the Trade Secrets that they have taken with them.  For example, with the Individual Defendants' knowledge of PRG pricing, they can undercut PRG with respect to prospective customers; and, as for existing customers, Defendants know the terms of those deals and, for at least one customer, they alone have the requisite information needed to negotiate a future deal.  Compl. ¶70.  Defendants can and should be enjoined from further actual or threatened trade secret misappropriation. 18 U.S.C. §1836(b)(3); C.R.S. § 7-74-103; *Synthes Spine,* 2009 WL 1655030, at *9.  Defendants' actions strongly infer one conclusion: the Individual Defendants intentionally and in concert disregarded their non-solicitation agreements and successfully solicited PRG customers and employees; and Defendants conspired to use, have used, and continue actively to use PRG's Trade Secrets to develop business for Cogent.  Indeed, PRG already has lost several employees and at least four substantial accounts to Defendants. Compl. ¶¶ 43, 69, 71(c), 73.[2]

Defendants' misconduct easily constitutes unlawful misappropriation under the DTSA and UTSA.  18 U.S.C. §1839(5); C.R.S. §7-74-102(2).  This is especially the case because "[m]isappropriation consists only of the improper disclosure or acquisition of the trade secret," and it is irrelevant whether Defendants have yet benefitted from PRG's information (though

---

[2] Dyer also solicited two additional PRG employees to leave PRG and join Cogent—Carter Dunham and Wendy Rubenkoenig—each of whom refused his offer and remains employed with PRG.  Compl. ¶44.

Defendants' successful solicitation of four of PRG's customers reflects they have benefitted). *Luzenac*, 576 F.3d at 1115. Injunctive relief is warranted under these circumstances.[3]

### 2. The Individual Defendants violated their contractual obligations to PRG.

PRG will prevail on the merits of its breach of contract claims. For the reasons discussed below, the Individual Defendants' agreements are enforceable because they fall under statutory exceptions to Colorado's non-compete law, C.R.S. § 8-2-113, the restrictions sought to be enforced are reasonable, and the Individual Defendants knowingly breached their respective agreements.

### a. The restrictions protect PRG's Trade Secrets.

The Individual Defendants entered into contracts with PRG in which each promised not to use or disclose the Trade Secrets on behalf of any person or entity other than PRG. *See* the Dyer Employment Agreement, Compl. Ex. A at §§ 3.2, 4.2(c); the Scoggins Non-Solicitation Agreement, Compl. Ex. B at §1.1; the Cadena Non-Solicitation Agreement, Compl. Ex. D at §§ 1.1(e), 4; and the Turner Non-Solicitation Agreement, Compl. Ex. G at §§ 1(e), 4. As such, their non-competition and non-solicitation restrictions fall within the Colorado statute's exception for "[a]ny contract for the protection of trade secrets." *See* C.R.S. §8-2-113(2)(b).[4] The Individual Defendants unequivocally breached their agreements by using and disclosing the information to

---

[3] The DTSA's limitations on injunctions that "prevent a person from entering into an employment relationship" or that "conflict with an applicable State law prohibiting restraints on the practice of a lawful trade or business" do not apply in this case. 18 U.S.C. §§ 1836(b)(3)(A)(i)(I), (II). As discussed below, the requested injunction would not conflict with Colorado's non-competition law as it allows restrictive covenants for the protection of trade secrets, and Dyer, Scoggins, and Cadena also fit in the exception for executive and management personnel. *See* Section IV(B)(2)(b), *infra*.

[4] Additionally, as set forth by the Tenth Circuit in *Luzenac*, a breach of contract claim may lie under Colorado law even if a claim is not established under the UTSA, and the contract and UTSA analyses differ slightly. *Luzenac*, 576 F.3d at 1116. Relevant factual questions include (1) whether the company made it clear that proprietary data and customer information were confidential; and (2) whether information used by a former employee "was exclusively in the public domain or known to him prior to his employment" with the company. *Id.* The answers to these questions support PRG's position.

benefit Cogent, a directly competing business formed by Dyer. Compl. ¶¶ 19, 41, 48-53, 55-56, 69-73.

### b. Dyer, Scoggins, and Cadena are executive and management personnel.

As to Dyer, Scoggins, and Cadena, and based on their duties and autonomy previously discussed, their non-competition and non-solicitation restrictions fall within the Colorado statute's exception for "[e]xecutive and management personnel . . . ." *See* C.R.S. §8-2-113(2)(d). Thus, independent of their misappropriation of Trade Secrets, their restrictions are enforceable. *Cf.*, *e.g.*, *Atmel Corp. v. Vitesse Semiconductor Corp.*, 30 P.3d 789, 794 (Colo. App. 2001) (finding an employee falls under the management personnel exception when he was "in charge" and acted "in an unsupervised manner"); *Harrison v. Albright*, 40 Colo. App. 227, 231 (1977) (finding an individual falls under the management personnel exception where he "was the only person who possessed the knowledge, skills, and the licenses to make the business a possible success").

### c. The Individual Defendants' restrictions are enforceable and reasonable.

The non-solicitation restrictions are also reasonable. In their respective agreements, the Individual Defendants made the following promises:

1. Dyer promised that:

   a. for one year after his employment with PRG ended, he would not engage in the competition he has been engaged in since the formation of Cogent (see the Dyer Employment Agreement, Compl. Ex. A at §§ 4.1(i), 4.1(ii), 4.2(a));

   b. for two years after his employment with PRG ended, he would not solicit certain PRG customers (see the Dyer Employment Agreement, Compl. Ex. A at §§ 4.1(iii), 4.1(iv), 4.2(b)); and

    c.  for two years after his employment with PRG ended, he would not recruit or hire PRG employees (see the Dyer Employment Agreement, Compl. Ex. A at §§ 4.1(v), 4.2(b)).

2.  Scoggins also promised that:

    a.  for one year after his employment with PRG ended, he would not engage in the competition he has been engaged in since joining Cogent (see the Scoggins Non-Solicitation Agreement, Compl. Ex. B at §2.1(a));

    b.  for one year after his employment with PRG ended, he would not solicit certain PRG customers (see the Scoggins Non-Solicitation Agreement, Compl. Ex. B at §2.1(c)); and

    c.  for one year after his employment with PRG ended, he would not recruit or hire PRG employees (see the Scoggins Non-Solicitation Agreement, Compl. Ex. B at §2.1(d)).

3.  Cadena also promised that:

    a.  for eighteen months after his employment with PRG ended, he would not engage in the competition he has been engaged in since joining Cogent (see the Cadena Non-Solicitation Agreement, Compl. Exs. D at §1(b)(i));

    b.  for one eighteen months after his employment with PRG ended, he would not solicit certain PRG customers (see the Cadena Non-Solicitation Agreement, Compl. Exs. D at §1.1(b)(ii), 1.1(b)(iv)); and

    c.  for eighteen months after his employment with PRG ended, he would not recruit or hire PRG employees (see the Cadena Non-Solicitation Agreement, Compl. Exs. D at §1.1(b)(iii)).

4. Turner also promised that:

    a. for eighteen months after his employment with PRG ended, he would not engage in the competition he has been engaged in since joining Cogent (see the Turner Non-Solicitation Agreement, Compl. Ex. G at §1(b)(i));

    b. for one eighteen months after his employment with PRG ended, he would not solicit certain PRG customers (see the Turner Non-Solicitation Agreement, Compl. Ex. G at §1(b)(ii), 1.1(b)(iv)); and

    c. for eighteen months after his employment with PRG ended, he would not recruit or hire PRG employees (see the Turner Non-Solicitation Agreement, Compl. Ex. G at §1(b)(iii)).

The weight of Colorado case law finds provisions similar to those here are reasonable. *See, e.g.*, *Synthes Spine*, 2009 WL 1655030, at *10 ("Colorado courts have repeatedly upheld covenants not to compete that restricted an employee for longer than one year. *See, e.g., Zeff, Farrington & Associates, Inc. v. Farrington*, 168 Colo. 48, 449 P.2d 813, 814 (Colo. 1969) (upholding three-year, 200-mile restriction); *Weber v. Nonpareil Baking Co*. 85 Colo. 232, 274 P. 932 (1929) (upholding perpetual covenant); *Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 525 (Colo. App. 2011) (non-solicitation clause that referenced confidential information, but not trade secrets, and precluded solicitation of all company customers enforceable); *Gold Messenger, Inc. v. McGuay*, 937 P.2d 907, 910-11 (Colo. App. 1997*)* (holding covenant to "not engage, in any fashion[,] 'in any other business which offers or sells any product or service (or component thereof) which comprises or may in the future comprise a part of the Franchisor's franchise system or which competes directly or indirectly with Franchisor's system" as narrowly tailored for the protection of trade secrets); *Management Recruiters of Boulder v. Miller*, 762 P.2d 763, 766 (Colo. App.

1982) (barring for one year a former employee's solicitation of customers whom he had contacted during his last year of employment); *Miller v. Kendall*, 541 P.2d 126, 127–28 (Colo. App. 1975) (enforcing two-year covenant barring instructor from soliciting former students); *Taff v. Brayman*, 518 P.2d 298, 299 (Colo. App. 1974) (upholding two-year, 65-mile restriction); *see also Shidler*, 338 F.3d 1125, 1133 (holding covenant not to compete "directly or indirectly in the teaching of infants or young children to swim or engage in the business or training other individuals for the purpose of teaching infants or young children to swim" as narrowly drawn to protect trade secrets).[5]  Here, at least Dyer has solicited PRG employees; and each Individual Defendant has violated his non-competition and non-solicitation-of-customers restrictions and has used and is using PRG's Trade Secrets in doing so.[6]

### 3. *Defendants intentionally interfered with PRG's contractual relations.*

To establish a claim for intentional interference with contractual relations, PRG must show that one or more Defendants (1) was aware of the contract between PRG and one or more Individual Defendants, (2) intended that the Individual Defendant breach his contractual

---

[5] If the Court were to find the agreements unreasonable in either duration or scope, it has discretion to modify the terms of the agreements to render them reasonable and enforceable. *See Gulick v. A. Robert Strawn & Assoc.*, 477 P.2d 489, 493 (Colo. App. 1970). Indeed, the parties expressly stated their desire that the Court do so. *See* Compl. Ex. A at §4.3; Compl. Ex. B at §4.7; Compl. Ex. D at §8; Compl. Ex. G at §8.

[6] Dyer's contract states that it is governed by New York law. Compl. Ex. A at §7.9. Unlike Colorado, New York law does not limit enforcement of non-competition and non-solicitation restrictions to agreements either for the protection of trade secrets or with executive and management personnel. Under New York law the enforceability of Dyer's restrictions is even clearer. *See, e.g.*, *Johnson Controls, Inc. v. A.P.T. Critical Systems, Inc.*, 323 F. Supp. 2d 525, 536, 542 (S.D.N.Y. 2004) (enjoining former employees from starting competing business in violation of their non-competition covenants and acknowledging such competition threatened to undermine the goodwill created by the employees on the former employer's behalf); *Group Health Solutions Inc. v. Smith*, 938 N.Y.S.2d 227, 227 (Sup. Ct. NY 2011) (holding that client goodwill is a legitimate basis for non-competition covenant, regardless of whether confidential information is at issue); *Mallory Factor, Inc. v. Schwartz*, 146 A.D.2d 465, 467–68, 536 N.Y.S.2d 752, 753–54 (1989) (enforcing 18-month restriction prohibiting former employee from working on any account either the employee or the company had been involved with during employee's employment with the company).

obligations to PRG, and (3) induced the Individual Defendant to do so.  *Slater Numismatics, LLC v. Driving Force, LLC*, 310 P.3d 185, 189 (Colo. App. 2012).  PRG has met these criteria.

Each Defendant was aware that each Individual Defendant had contractual obligations (1) not to use or disclose PRG's confidential information, (2) not to engage in the very competition that each now is engaged in on behalf of Cogent, (3) not to solicit PRG employees (including those that Dyer and possibly other Individual Defendants already have solicited), and (4) no to solicit certain PRG customers (including those they already have solicited).  Cogent intended that Dyer (and possibly other Individual Defendants) use PRG's confidential information, engage in direct competition with PRG, and solicit PRG employees and customers, and induced him to do so; and Cogent intended that each of the other Individual Defendants also use PRG's confidential information, engage in direct competition with PRG, and solicit PRG customers (and possibly its employees as well), and induced each to do so.  For his part, Dyer intended that the other Individual Defendants engage in direct competition with PRG, use PRG's confidential information, and solicit PRG customers, and he induced them to do so.  The circumstances further suggest that Scoggins, Cadena, and/or Turner intended that one or more of them solicit PRG customers, and that he induced one or more of them to do so.  As such, Defendants have intentionally interfered with PRG's contracts with each Individual Defendant and will continue to do so unless enjoined.

### C.   An Injunction Is Necessary to Prevent Immediate, Irreparable Harm to PRG that Cannot Adequately Be Compensated by Money Damages.

PRG can demonstrate that it will suffer irreparable harm if the Court does not issue injunctive relief.[7]  The actual use of PRG's Trade Secrets, coupled with the threat of its continued

---

[7] While it can do so, PRG need not make a separate showing of irreparable harm. "Because both the DTSA, 18 U.S.C. § 1836(b)(3)(A), and CUTSA, C.R.S. § 7-74-103, provide for injunctive relief to prevent misuse of trade secrets, irreparable harm presumptively exists if Defendants have misused, or are likely to misuse, trade secrets." *Engility Corp. v. Daniels,* No. 16-cv-2473, 2016 WL 7034976, at *11 (D. Colo. Dec. 2, 2016), citing *Star Fuel Marts, LLC v. Sam's East, Inc.*, 362 F.3d 639, 651 (10th Cir. 2004) ("The irreparable

use and disclosure by Defendants for the benefit of Cogent, are ample grounds for enjoining Defendants.  Money damages cannot make PRG whole for the loss of its Trade Secrets, nor can it reestablish PRG's competitive position in the audio-visual event production marketplace, which position is certain to be eroded substantially unless Defendants are enjoined.  Likewise, the actual, and successful, solicitations of PRG employees and at least four of its customers already reflects that Defendants will continue to solicit PRG's employees and customers unless enjoined from doing so.  *See Sizewise Rentals, Inc. v. Mediq/PRN Life Support Services, Inc.*, 87 F. Supp. 2d 1194, 1200 (10th Cir. 2000) (noting that there is an "inherent difficulty in quantifying the loss of [plaintiff's] competitive advantage in the marketplace, and the damages resulting from loss of customers and good will").

### D.   The Balance of Equities Favors Entering an Injunction against Defendants.

The balance of equities favors granting this Motion.  PRG's interests in the protection of its Trade Secrets and its customer and employee relationships relate to a very specific niche market—audio-visual event production.  Given the Individual Defendants' actual and inevitable use and disclosure of PRG's Trade Secrets while working for Cogent, the Individual Defendants should be precluded from working for Cogent.  They can still earn a living in audio-visual event production elsewhere, just not selling the narrow line of competing services to an identical customer base.

The threat of harm posed to PRG as a result of Defendants' actual and threatened use of PRG's trade secrets and/or disclosure to Cogent, PRG's direct competitor, outweighs any harm to Defendants.  *Xantrex Tech., Inc. v. Advanced Energy Indus.,* No. 07-cv-02324, 2008 WL 2185882,

---

harm element thus automatically favors [PRG.]").; *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001); *Atchison, Topeka & Santa Fe Ry. Co. v. Lennen*, 640 F.2d 255, 259 (10th Cir. 1981).

at *16 (D. Colo. May 23, 2008) (holding that the threat and harm posed to plaintiff company as the result of disclosure of its trade secrets outweighed any possible harm to the defendants).

### E. **Granting PRG's Motion Is in the Public Interest.**

It is well-settled that "the public has an interest in protecting valid trade secrets and preventing unfair competition." *Electrology Lab., Inc. v. Kunze*, 169 F. Supp. 3d 1119, 1165 (D. Colo. 2016); *see also, e.g., Xantrex*, 2008 WL 2185882, at *16 ("the public interest favors entry of an injunction because the public never benefits from trade secret misappropriation"). Moreover, PRG submits that it is in the public interest as well to protect and preserve the integrity of contractual commitments between employers and employees. *See, e.g., I Can't Believe It's Yogurt v. Gunn*, No. 95-ok-2109, 1997 WL 599391, *20 (D. Colo. Apr. 15, 1997) (holding "[t]here is a public interest in the enforcement of a valid covenant not to compete"). Accordingly, this factor also weighs in favor of granting PRG's requested injunction.

### V. POSTING OF SECURITY PURSUANT TO FED. R. CIV. P. 65(c)

PRG states that no injury or damage will be sustained by Defendants if the requested preliminary injunction is issued. However, in accordance with Fed. R. Civ. P. 65(c), PRG offers to give security in the sum of $5,000.00 for each Defendant for payment of any damages which may be incurred by a Defendant if such preliminary injunction is later found to have been improperly issued as to him or it.

### VI. CONCLUSION

WHEREFORE, for the foregoing reasons, PRG respectfully requests that the Court grant the relief requested herein.

Respectfully submitted this 16th day of July, 2018.

_s/ Peter R. Bulmer_

Peter R. Bulmer
Jackson Lewis P.C.
150 N. Michigan Ave., Suite 2500
Chicago, Illinois 60601
(312) 787-4949 (telephone)
(312) 787-4995 (facsimile)
BulmerP@jacksonlewis.com

Ryan P. Lessmann
Jonathan H. Geneus
Jackson Lewis P.C.
950 17th Street, Suite 2600
Denver, Colorado 80202
(303) 892-0404 (telephone)
(303) 892-5575 (facsimile)
LessmannR@jacksonlewis.com
Jonathan.Geneus@jacksonlewis.com

_Attorneys for Plaintiff Production Resource_
_Group, L.L.C._

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 16th day of July, 2018, a true and correct copy of the foregoing **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** was filed via CM/ECF, and that copies of same were served via U.S. Mail, first-class postage prepaid, upon Defendants at the following addresses:

Kevin Scoggins
7069 Upham Street
Arvada, CO 80003

Gregory Turner
8155 E. Fairmount Drive, #1224
Denver, CO 80230

Cogent Global Solution, Inc.
c/o Registered Agents, Inc.
1942 Broadway Street, Suite 314C
Boulder, CO 80302

Jose Cadena
9759 Stonebriar Lane
Parker, CO 80134

Timothy Dyer
85 Buckhorn Drive
Littleton, CO 80127

*s/Carol Drayton*
for Jackson Lewis P.C.